# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                Case No. 06-CR-326

AARON S. ANDRACEK,

        Defendant.

## RECOMMENDATION TO CHIEF JUDGE RUDOLPH T. RANDA REGARDING THE DEFENDANT'S MOTION TO SUPPRESS

On December 12, 2006, the grand jury returned a single count indictment charging Aaron S. Andracek ("Andracek") with possession of child pornography in violation Title 18, United States Code, Section 2252A(a)(5)(B). Also included in the indictment was a notice of forfeiture.

On February 1, 2007, Andracek filed a motion to suppress statements and the fruits of a search. In his motion, Andracek requested an evidentiary hearing. This court granted Andracek's request for an evidentiary hearing and a hearing was conducted on March 5, 2007. The court ordered the parties to submit post-hearing briefs and the pleadings on the defendant's motions to suppress are now closed. The deadline for proposed voir dire questions and proposed jury instructions is April 12, 2007, and a jury trial is scheduled to commence on April 16, 2007 before Chief Judge Rudolph T. Randa.

### EVIDENTIARY HEARING SUMMARY

The government called four witnesses, all of whom are employees of the Bureau of Immigration and Customs Enforcement ("ICE").

**Senior Special Agent Elizabeth Hanson**

ICE Senior Special Agent Elizabeth Hanson ("SSA Hanson") testified that she works primarily as a computer forensic examiner and her duties include the investigation of crimes relating to child pornography. (Tr. 5.) SSA Hanson was the case agent assigned to the investigation of Andracek, and at about 10 a.m. on October 10, 2006, SSA Hanson and ICE Special Agent Richard Hanson, ("SA Hanson") went to the home of Andracek's parents in an effort to make contact with Andracek. (Tr. 6.) SSA Hanson and SA Hanson are not related. (Tr. 48.) Andracek was not at that residence and SSA Hanson left a message for Andracek to contact her. (Tr. 6.)

At about 12:45 p.m., Andracek called SSA Hanson. (Tr. 7.) SSA Hanson told Andracek that she was investigating a possible identity theft either by way of credit card or over the internet. (Tr. 7.) Adracek stated that he did not have any credit cards, to which SSA Hanson stated that his internet usage may have been part of an identity theft. (Tr. 7.) Andracek stated that he had a computer and that it was at his apartment. (Tr. 7.) SSA Hanson set up a time to meet with Andracek at his apartment. (Tr. 7-8.)

About fifteen or 20 minutes later, Andracek again called SSA Hanson and told him that he forgot to tell SSA that he had reformatted his computer over the past weekend. (R. 8.) Andracek stated that he was playing a computer game when the computer locked up several times and asked him for a password. (Tr. 8.) SSA Hanson stated that she would still like to see his computer (Tr. 8-9.) Andracek then asked if he could come into the ICE office. (Tr. 10.) SSA Hanson said this would be acceptable, and Andracek stated that he would be there within the hour. (Tr. 10.)

Andracek arrived alone at the ICE office at approximately 1:30 p.m., at which time SSA Hanson and SA Hanson escorted him to the ICE conference room and shut the door. (Tr. 10.) SSA Hanson described the conference room as being about twelve feet by fifteen feet with a large table in the middle that is surrounded by about seven to eight chairs. (Tr. 11.) It is ICE policy to have at

least two ICE individuals present during all interviews. (Tr. 11.) Both agents were dressed in plain clothes with their guns and handcuffs covered. (Tr. 12.)

SSA Hanson testified that her statement to Andracek indicating that she was investigating the possibility that his identity was compromised was largely a ruse and that her primary intent was to investigate Anracek for possession of child pornography. (Tr. 12.) However, SSA Hanson stated that it was always a possibility that an individual's computer may have been utilized by another and thus the owner of the computer may not have been the one responsible for the child pornography. (Tr. 11-12.)

SSA Hanson described Andracek's demeanor as quiet, somewhat reserved, and concerned as to why he was being investigated, but he did not seem overly nervous. (Tr. 12.) SSA Hanson introduced herself, showed him her credentials, and advised him that he was there voluntarily and could leave if he wanted to. (Tr. 12-13.) SSA Hanson then asked him some preliminary questions regarding his internet service provider. (R. 12-13.) SSA Hanson then asked him if he had ever used a peer-to-peer file sharing system. (R. 13.) SSA Hanson then asked Andracek if he had accessed pornography through his computer and Andracek stated that he had viewed adult pornography. (Tr. 14.) SSA Hanson asked Andracek if he had specifically viewed a video file with a certain name, to which Andracek replied that he may have. (Tr. 14.) After being asked if he could recall what was depicted in this video, Andracek stated that he believed it was pornography. (Tr. 14.) SSA Hanson replied that it was specifically child pornography and asked Andracek whether he recalled that. (Tr. 14.) Andracek sat silently for a few seconds and then stated that the file might have depicted child pornography. (Tr. 15.)

SSA Hanson then asked Andracek additional questions regarding his having reformatted his computer, to which Andracek provided information similar to that he provided SSA Hanson on the phone. (Tr. 15.) In response to further questions regarding other child pornography that Andracek

3

may have on his computer, Andracek replied that he had ten to forty movie files of child pornography. (Tr. 16.) SSA Hanson described Andracek's demeanor during this portion of the conversation as very cautious; he sat quietly and appeared to be thinking. (Tr. 16.)

SSA Hanson then presented Andracek with a consent to search form, which she handed to Andracek, and he sat and appeared to read the form because he stared at the form for an extremely long time. (Tr. 16-17.) SSA Hanson then read the form to Andracek, at which time Andracek again reviewed the form. (Tr. 17-18.) Andracek then asked SSA Hanson what would be the consequences if he had child pornography on his computer. (Tr. 18.) SSA Hanson advised him that the consequences could be wide-ranging depending upon the quantity and character of the files; the matter may be prosecuted in either state or federal court, but as a federal law enforcement officer, any case she investigated would first be presented to the United States Attorney's office. (Tr. 18-19.) Andracek then inquired as to potential penalties and SSA Hanson stated that penalties varied depending upon whether a case was prosecuted in the federal or state system but could range anywhere from probation to jail time. (Tr. 19.) SSA Hanson did not inform him the differing penalties between the crimes of possessing versus distributing child pornography, the maximum penalty for such crimes, or the federal sentencing guidelines. (Tr. 36.)

SSA Hanson further informed Andracek that he should not sign the consent to search form if he felt he was being coerced in anyway. (Tr. 20.) Andracek stated that he understood and agreed to sign the form. (Tr. 20.) Andracek initialed the form in various places and SSA Hanson signed the form as a witness. (Tr. 21.) A notation on the form indicates that it was signed at 3:34 p.m. A copy of this form was received as Exhibit 1. (Tr. 21-22.)

After signing the form, SSA Hanson asked Andracek to lead them to his residence. (Tr. 22.) SA Hanson had intended to accompany SSA Hanson but as they were leaving, SA Hanson, as the Special Agent on duty, was required to attend to another matter. SSA Hanson then contacted ICE

4

Special Agent Scott Lindsey ("SA Lindsey"), who works at a different building, to accompany her to Andracek's apartment.

SSA Hanson and Andracek were driving in separate vehicles and SSA Hanson had to stop to tell Andracek that they had to first stop at another ICE office, which was located a short distance away. (Tr. 23.) Andracek agreed and followed SSA Hanson to the other office. (Tr. 23-24.) While at the other ICE office, Andracek got out of his car, approached SSA Hanson, and asked if he could withdraw his consent. (Tr. 24.) SSA Hanson replied that he could withdraw his consent but stated that she thought he should think about it on the way to his residence and if he still wanted to withdraw his consent, he could do it at that time. (Tr. 24.) SSA Hanson testified that she told Andracek to think it over because she thought he would benefit from the additional time to think in light of the fact that it took him so long to initially decide to consent. (Tr. 39.) In response, Andracek nodded his head and said OK. (Tr. 24.) Andracek then led SA Lindsey and SSA Hanson, all of whom were driving in separate cars, to his residence, which was located about fifteen minutes away. (Tr. 24.)

Once they all arrived at Andracek's apartment, while still outside, SSA Hanson advised SA Lindsey that Andracek was considering withdrawing his consent. (R. 25.) SSA Hanson told Andracek it would probably take only ten to fifteen minutes for her to look at Andracek's computer. (Tr. 26.) SA Lindsey told Andracek that this could be cleared up in a couple of minutes and because they already came to the apartment, they might as well just go and do what they came to do. (Tr. 26.) Andracek thought about this for a couple seconds then pointed the way to his apartment. (Tr. 26.)

Andracek opened the door and the agents followed him into the apartment. (Tr. 27.) Andracek had previously advised SSA Hanson that he had a small amount of marijuana in his apartment and SSA Hanson said that this was not the focus of her investigation and that he would

5

be required to flush the marijuana. (Tr. 27-28.) After entering the apartment, Andracek flushed the marijuana, and then stated that he did not reformat his computer. (Tr. 28.) SSA Hanson testified that at this time her tone changed to be firmer and more serious and she said that this was the time for Andracek to tell the truth and that he had a "free pass" for what he said earlier. (Tr. 32.) SSA Hanson then asked how many files of child pornography were on his computer and Andracek replied that there were ten to forty. (Tr. 28.)

SSA Hanson began to examine the computer but quickly recognized that she had failed to bring along a necessary piece of equipment. (Tr. 29.) SSA Hanson then advised Andracek that she was going to temporarily seize the computer and analyze it at the office. (Tr. 30.) Andracek replied that he thought the analysis was going to be done at his apartment. (Tr. 30.) SSA Hanson again advised him that he could withdraw his consent but if he did so, SA Lindsey would remain at the apartment while she requested a warrant. (Tr. 31.) In response, Andracek agreed to allow SSA Hanson take the computer. The agents were in the apartment less than ten minutes before taking custody of the computer. (Tr. 33.)

**Special Agent Richard Hanson**

SA Hanson's primary duty regarding the investigation of Andracek was to assist SSA Hanson with her interview of Andracek. (Tr. 48.) SA Hanson was present for most of SSA Hanson's interview of Andracek but frequently was called out of the conference room to tend to other responsibilities. (Tr. 54.) Whenever SA Hanson left the room, Investigative Assistant Carmen Silva ("Silva") filled in for SA Hanson. (Tr. 55.) SA Hanson was present when Andracek signed Exhibit 1 and SA Hanson recalls Andracek asking questions about possible penalties for child pornography offenses prior to signing the form. (Tr. 50.) SA Hanson recalled that SSA Hanson advised Andracek of the differences between the state and federal systems with respect to child

pornography offenses. (Tr. 50-51.) SSA Hanson did not get into the specifics of these distinctions but rather simply stated they were different. (Tr. 53.)

**Special Agent Scott Lindsey**

SA Lindsey was contacted by SSA Hanson who requested his assistance in the investigation of Andracek. (Tr. 57.) On the way over to Andracek's apartment, SSA Hanson had notified SA Lindsey over the radio that Andracek was considering withdrawing his consent. (Tr. 60.) After following Andracek to his apartment, SA Lindsey approached SSA Hanson and Andracek who were near a vehicle by his residence. (Tr. 59.) SA Lindsey introduced himself in a casual manner, consciously trying to keep the atmosphere light. (Tr. 59.) SA Lindsey was able to see that Andracek was nervous. (R. 59.) Andracek asked SA Lindsey what the potential penalties were if he was convicted and SA Lindsey replied that there were a wide variety of possible outcomes. (Tr. 61.)

Andracek was informed that he could withdraw his consent at any time but SA Lindsey also told him that if he withdrew his consent, that did not mean that they would go away. (Tr. 62-63.) Because the agents had reason to believe that child pornography may be on his computer, they would continue their investigation to its logical conclusion and withdrawing consent would simply complicate matters. (Tr. 62-63.) Andracek then indicated that he was willing to go ahead and allow the review of his computer. (Tr. 62.) Andracek then led the way to the apartment, opened the door, and went inside with the agents following him. (Tr. 62-63.)

Soon after going inside, SSA Hanson recognized that she lacked a crucial piece of equipment to analyze the computer. (Tr. 65.) SSA Hanson informed Adracek that she needed to take the computer back to her officer and analyze it there. (Tr. 65.) Andracek was reluctant to permit SSA Hanson to take his computer and SSA (Tr. 65, 71.) Hanson said that he could withdraw his consent, but because he had indicated that the computer may still contain child pornography, SA Lindsay would remain there as she sought a warrant. (Tr. 65-66.)

At no point during the fifteen to twenty minutes that the agents spent in Andracek's apartment did either agent make any threats or promises to Andracek. (Tr. 66-67.) SA Lindsay testified that the overall tone of their conversation with Andracek was easygoing. (Tr. 67.)

**Investigative Assistant Carmen Silva**

Silva was asked to sit in on SSA Hanson's interview of Andracek during the two or three times that SA Hanson had to leave the conference room to attend to other matters. (Tr. 75.) Silva estimates that she spent a total of about fifteen minutes in the conference room. (Tr. 75.) Silva described Andracek's demeanor as quiet and recalls him asking what the difference would be if this case was handled in the federal versus the state systems. (Tr. 76.) Andracek never asked to leave and voices were never raised. (Tr. 76-77.) Andracek kept looking at the blank consent form but Silva does not recall Andracek asking any questions about the form or any other topic. (Tr. 77-78.)

## ANALYSIS

In Schneckloth v. Bustamonte, the Supreme Court stated: "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." 412 U.S. 218, 227 (1973). This court considers a number of factors when determining whether consent to search was voluntary: "age, education, and intelligence of the defendant; advisement of his rights; how long he was detained prior to the consent; repeated requests for consent; physical coercion; and whether he was in custody." United States v. Kozinski, 16 F.3d 795, 810 (7th Cir.1994); see also Schneckloth, 412 U.S. at 226. A determination of voluntariness does not ride on "the presence or absence of a single controlling factor," but that the court must make a "careful scrutiny of all the surrounding circumstances." Schneckloth, 412 U.S. at 226. The government must prove, by a preponderance of the evidence, that consent was freely given. United States v. Raibley, 243 F.3d 1069, 1076 (7th Cir. 2001).

Andracek argues that his consent was not voluntary because he believed that he would not be prosecuted because SSA Hanson had said that he had a "free pass" after he admitted lying to her about having reformatted his computer. Based upon the evidence elicited regarding this statement, it should have been clear to Andracek that SSA Hanson's passing comment regarding a "free pass" was limited to Andracek's prior untruthful statements. Thus, SSA Hanson was saying that she would not hold it against him that he had lied to her about reformatting his computer in the past, and perhaps even promising that he would not be criminally prosecuted for making such false statements, but emphasizing that if he continued to lie, she would not be so forgiving in the future.

Notwithstanding defendant's argument, it is simply illogical and unreasonable to conclude that a reasonable person would think that SSA Hanson was promising that Andracek would not be prosecuted for any crimes he may have alluded to previously. A reasonable person who has just been caught in a lie to a federal agent would not believe that, as a reward for those earlier lies, not only will the federal agent forego any consequences for lying, but provide a "free pass" or immunization from prosecution for any other crime he may have alluded to. Such an argument is illogical and unpersuasive. Thus, it is the court's conclusion that SSA Hanson's comment did not render his statements or consent involuntary and therefore cannot form the basis for suppression.

Andracek next argues that his consent was not voluntary because of the agents' threat to get a warrant, failure to inform him that his consent to search the computer was not consent to seize the computer, and other misrepresentations.

As for Andracek's claim that his consent was not voluntary based upon the fact that the agents failed to inform him that consent to search his computer was not also consent to seize his computer, the court finds this fact insufficient to render his consent involuntary.

There is no legal support for the government's position that Andracek's signed consent to the search of his computer also authorized the ICE agents to remove the computer from the

9

residence and take it to the ICE officer in order to complete their search. Although Andracek's consent to have his computer searched necessarily included consent to some degree of a seizure of his computer, see United States v. Jacobsen, 466 U.S. 109, 113 (1984) ("A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."), it is clear that Andracek's consent to any seizure of his property was so limited. The consent form is quite explicit that it is limited to a search; in fact the words "seize," "seizure," or any similar words are not used in the form. Thus, the only seizure authorized would be that which is inherently necessary to effect that search. In this case, based upon the text of the form and Andracek's discussions with the agents prior to SSA Hanson recognizing that she lacked a necessary piece of equipment, it is clear that Andracek's consent was limited to an examination of his computer in his apartment. Thus, if Andracek consented to the seizure and removal of his computer, such consent must be found elsewhere than the signed consent form or the verbal consent he offered prior to SSA Hanson's realization that she lacked a necessary piece of equipment.

It is clear from the testimony of SSA Hanson that she did not ask for Andracek's consent for the seizure of the computer prior to announcing that she was going to have to take the computer back to her office and analyze it there. SSA Hanson testified: "I advised Aaron that because I had forgot this essential piece of evidence that an on-site inspection was not going to be possible, and that I was going to temporarily seize his computer, transport it to my office, where I would do a computer exam thereafter." (Tr. 30.) If Andracek had merely acquiesced to this assertion of apparent lawful authority, given Andracek's lack of consent, SSA Hanson's seizure would have been without a lawful basis. See Bumper v. North Carolina, 391 U.S. 543, 550 (1968). However, Andracek did speak-up and voice his concerns regarding the seizure and removal of his computer. In response, SSA Hanson advised Andracek that he was able to withdraw his consent at this point. This was an inaccurate statement because the issue was not one of withdrawing consent, because

10

consent to the seizure had never been given. Rather, before SSA Hanson could lawfully seize the computer, Andracek was required to affirmatively and voluntarily give his consent.

SSA Hanson never asked for Andracek's consent to seize the computer. All of her subsequent discussions were phrased in the context of Andracek withdrawing his consent, apparently a result of a mistaken belief that Andracek had already consented to the seizure. It was at this point that SSA Hanson informed him that if he chose to withdraw his consent, SA Lindsey would stay behind in the apartment while SSA Hanson sought a warrant. Thus, the question presented to this court is whether a person stating he did not wish to withdraw consent after being asked by law enforcement if he wished to withdraw his consent can be equivalent to his granting consent?

Analyzing the totality of the circumstances presented in this case, the court believes that Andracek voluntarily consented to the seizure and removal of his computer, despite the fact that this consent came in response to questions of whether he wanted to withdraw consent that he never gave. SSA Hanson testified that in response to being advised that he could withdraw his consent, Andracek "basically said fine, go ahead and take the computer." (Tr. 31.) SA Lindsey recounted Andracek's response as "[h]esitant, and then basically said, well, you're already here, it's already done, we'll just go through with the consensual seizure of it." (Tr. 66.)

The matter is largely one of phraseology. Although phraseology often has substantial constitutional significance, the court is satisfied that in this case, the fact that SSA Hanson presented the question as one of whether Andracek wanted to withdraw his consent versus provide his consent, is of insignificant consequence. It is clear from the totality of the circumstances that the conversation between SSA Hanson and Andracek was essentially, "Can we take your computer?" to which Andracek replied, "Go ahead." Thus, Andracek consented to the seizure.

11

The totality of the circumstances indicate that Andracek's consent was voluntary. Andracek was not in custody but rather voluntarily came to the ICE agents' office and then voluntarily agreed to direct them to his apartment while driving alone in his own car. There is absolutely no evidence that there was any degree of physical coercion. There is also no evidence to suggest that the agents repeatedly asked for consent aside from the fact that SSA Hanson asked for consent to search and then again to seize the computer. Although the issue of consent was repeatedly discussed, for example after Andracek inquired whether he could withdraw his consent and the agents told him to think about it, Andracek never refused and then was asked to consent again. And finally, the consent form he signed included separate paragraphs that Andracek initialed, which state that he is aware that data on the computer may be used as evidence against him in court, that he had a right to refuse to consent, and he had a right to withdraw his consent.

As for the agents' statements indicating that they would be requesting a warrant if Andracek did not consent to the seizure of his computer, this can hardly be considered a threat. This was a logical alternative if Andracek did not consent to the seizure of his computer. Obtaining a warrant is adherence to the text of the Constitution, and in particular, the Fourth Amendment. Under the attendant circumstances, the agent's statement to abide by the Constitution and seek a warrant cannot be considered a threat.

Furthermore, it was not as if the agents stated that a warrant was inevitable. In their testimony, the agents were careful to distinguish that they told Andracek that a warrant would be requested, rather than stating that a warrant would be obtained. (See Tr. 43-44; 71-72 ("[Defense Counsel]: So he was told, if you withdraw here's what's gonna happen: somebody's staying here to watch this computer and we're gonna go get a search warrant. [SA Lindsey]: We'll seek a search warrant."(Tr. 72).) A law enforcement officer's statement that he will certainly be granted a warrant may be sufficient to render a person's consent involuntary, particularly if the officer lacked

sufficient probable cause to obtain a warrant. See United States v. Boukater, 409 F.2d 537, 538 (Former 5th Cir. 1969). However, there is no indication that either SA Lindsey or SSA Hanson made such statements to Andracek and even if either had, it would have been unlikely to have rendered Andracek consent involuntary given that it appears that the agents had more than sufficient probable cause to obtain a warrant.

In light of the fact that Andracek had admitted that his computer contained contraband, Andracek apparently believed that the issuance of a warrant was reasonably certain and thus he was faced with the realization that the agents were going to seize his computer one way or another. When faced with such a realization, a person may regard cooperation and consent to be the more advantageous path, and simply because consent is presented as the better path does not render consent involuntary.

Because this court finds that the government has met its burden in demonstrating that, under the totality of the circumstances, Andracek voluntarily consented to the search and seizure of his computer, the court shall recommend that his motion to suppress physical evidence be denied. There is similarly no evidence that indicates that Andracek's statements were involuntary and thus this court shall recommend that Andracek's motion to suppress statements be denied.

**IT IS THEREFORE RECOMMENDED** that Andracek's motion to suppress be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures.

Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this <u>29th</u> day of March, 2007.

<u>s/AARON E. GOODSTEIN</u><br>
U.S. Magistrate Judge